**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 24-3346
_____

SHAWN MCLOUGHLIN; ROBERT MILLER; ANGELO
SOFOCLEOUS; ANDREW LEWIS; CHEYNE BUNNETT;
TOM ROBERTSHAW; OLIVIA SCOTT, as the personal
representative of the estate of Russell Scott,
Appellants

v.

CANTOR FITZGERALD L.P.; BGC HOLDINGS L.P.;
NEWMARK HOLDINGS L.P.
_____

On Appeal from the United States District Court
for the District of Delaware
D.C. Civil No. 1:23-cv-00256
District Judge: Honorable Colm F. Connolly
_____

Argued: September 17, 2025

Before: BIBAS, MONTGOMERY-REEVES, and AMBRO,
*Circuit Judges*.

(Filed: December 15, 2025)

Blake A. Bennett
Cooch & Taylor
1000 North West Street
Suite 1500
Wilmington, DE 19801

Stephen Lagos
Alex Potter
Kyle W. Roche  **[ARGUED]**
Freedman Normand Friedland
155 E 44th Street
Suite 915
New York, NY 10017

*Counsel for Appellants Shawn McLoughlin; Robert Miller;
Angelo Sofocleous; Andrew Lewis; Cheyne Burnett; Tom
Robertshaw; and Olivia Scott, as the personal representative
of the estate of Russell Scott.*

Tacy F. Flint
Sidley Austin
One S Dearborn Street
Chicago, IL 60603

Anne S. Gaza
Robert M. Vrana
Young Conaway Stargatt & Taylor
1000 N King Street
Rodney Square
Wilmington, DE 19801

James R. Horner
Benjamin R. Nagin
Sidley Austin
787 Seventh Avenue
New York, NY 10019

David A. Paul  **[ARGUED]**
Cantor Fitzgerald
110 E 59th Street
7th Floor
New York, NY 10022

*Counsel for Appellees Cantor Fitzgerald L.P., BGC Holdings L.P., and Newmark Holdings L.P.*

————————————

OPINION OF THE COURT
————————————

MONTGOMERY-REEVES, *Circuit Judge.*

When a partner left the partnerships of Cantor Fitzgerald L.P., BGC Holdings L.P., or Newmark Holdings L.P., he was eligible to receive a sum of money at separation and four annual payments thereafter. But those four payments had strings attached; if the partnerships determined that a former partner was soliciting certain parties or competing, as broadly defined by the partnership agreements, the partnerships could withhold any outstanding payments. They did just that to several Former Partners,[1] who, in this suit,

---

[1] In this opinion, "Former Partners" refers to the plaintiffs-appellants in this case.

allege the strings were unreasonable restraints of trade that violated Section 1 of the Sherman Act. Two of the partners also allege that the termination of their payments violated Delaware's implied covenant of good faith and fair dealing.

These claims fail. As for the antitrust claims, the Former Partners' pecuniary injuries are not antitrust injuries because they do not derive from anticompetitive conduct that adversely affected the Former Partners' status as market participants. Nor are the Former Partners' injuries inextricably intertwined with an anticompetitive scheme; the partnerships sought to profit from the Former Partners, not from reduced competition in any labor market. As for the implied covenant claims, the partnerships had express contractual discretion to withhold the two Former Partners' installment payments under the relevant partnership agreements because those Former Partners competed against the partnerships. So there was no gap for the implied covenant to fill. And those Former Partners cannot claim, on these facts, that the partnerships exercised their discretion in bad faith. Thus, the District Court appropriately dismissed the Former Partners' Second Amended Complaint (the "Complaint"), and we will affirm the District Court's judgment.

## I.    BACKGROUND[2]

### A.    The Partnership Agreements

Cantor Fitzgerald L.P. ("Cantor Fitzgerald"), BGC Holdings L.P. ("BGC"), and Newmark Holdings L.P.

---

[2] The following facts are taken from the Complaint and the documents attached thereto, accepted as true, and viewed in the

("Newmark") are limited partnerships governed by partnership agreements. At all times relevant to this case, each agreement permitted partners to receive partnership units in return for pecuniary contributions to the partnership and for labor. At Cantor Fitzgerald, for example, partners could purchase—through "capital contributions" to the partnership—partnership units called "High Distribution Units."[3] Appendix (hereinafter "App._") 311. They also could receive partnership units called "Grant Units" and "Matching Grant Units" as compensation. App. 312.

When a partner separated from one of the partnerships, the partnership would redeem the partner's units, including the High Distribution Units, Grant Units, and Matching Grant Units (or their equivalents). The departing partner would receive an initial payout, which represented a portion of the capital contributed by the partner to the partnership. In exchange for the remainder of the partner's redeemed units, the partnership would pay the partner a defined sum of money in four annual installments paid on each anniversary of the initial payout. The Former Partners refer to these four installment payments as the "Conditioned Amounts." App. 312.

---

light most favorable to the Former Partners, as the plaintiffs. *See Doe v. Princeton Univ.*, 30 F.4th 335, 340 (3d Cir. 2022).

[3] BGC's and Newmark's partnership agreements refer to the same concepts in different terms. The Former Partners attached only BGC's and Newmark's partnership agreements to the Complaint but alleged that Cantor Fitzgerald's partnership agreement is substantially identical and pleaded certain of its provisions.

Payment of the Conditioned Amounts was not guaranteed, however. A former partner could receive Conditioned Amounts only if she refrained from "Competitive Activity,"[4] which generally included direct or indirect

---

[4] Under the partnership agreements, Competitive Activity occurs when a former partner:

(A) directly or indirectly, or by action in concert with others, solicits, induces, or influences, or attempts to solicit, induce or influence, any other partner, employee or consultant of any member of [Cantor Fitzgerald], [BGC] or [Newmark] or any other Affiliated Entity to terminate their employment or other business arrangements with any member of [Cantor Fitzgerald], [BGC] or [Newmark] or any other Affiliated Entity, or to engage in any Competing Business, or hires, employs, engages (including as a consultant or partner) or otherwise enters into a Competing Business with any such Person[;]

(B) solicits any of the customers of any member of [Cantor Fitzgerald], [BGC] or [Newmark] or any other Affiliated Entity (or any of their employees or service providers), induces such customers or their employees or service providers to reduce their volume of business with, terminate their relationship with or otherwise adversely affect their relationship with any member of [Cantor Fitzgerald], [BGC] or [Newmark] or any other Affiliated Entity;

solicitation of other partners, employees, consultants, or customers; efforts to adversely affect any of the partnerships' customer relationships; or engaging in "Competing Business."[5] App. 313–14.

---

> (C) does business with any person who was a customer of any member of [Cantor Fitzgerald], [BGC] or [Newmark] or any other Affiliated Entity during the twelve (12)-month period prior to such a Partner becoming a Terminated or Bankrupt Partner if such business would constitute a Competing Business;
>
> (D) directly or indirectly engages in, represents in any way, or is connected with, any Competing Business, directly competing with the business of any member of [Cantor Fitzgerald], [BGC] or [Newmark] or any other Affiliated Entity, whether such engagement shall be as an officer, director, owner, employee, partner, consultant, affiliate or other participant in any Competing Business; or
>
> (E) assists others in engaging in any Competing Business in the manner described in the foregoing clause (D).

App. 313–14.

[5] Competing Business includes activity that:

> (1) involves the development and operations of electronic trading systems,

Put differently, refraining from Competitive Activity was a condition precedent to payment of the Conditioned Amounts— a mechanism the Former Partners call the "Conditioned Payment Device."  App. 317; *see also Cantor Fitzgerald, L.P. v. Ainslie* (*Cantor II*), 312 A.3d 674, 685–86 (Del. 2024)

---

> (2) involves the conduct of the wholesale or institutional brokerage business,
>
> (3) consists of marketing, manipulating or distributing financial price information of a type supplied by any member of [Cantor Fitzgerald], [BGC] or [Newmark] or any other Affiliated Entity to information distribution services or
>
> (4) competes with any other business conducted by any member of [Cantor Fitzgerald], [BGC] or [Newmark] or any other Affiliated Entity if such business was first engaged in by any member of [Cantor Fitzgerald], [BGC] or [Newmark] or any other Affiliated Entity, or any member of [Cantor Fitzgerald], [BGC] or [Newmark] or any other Affiliated Entity took substantial steps in anticipation of commencing such business and prior to the date on which such Founding/Working Partner or REU Partner, as the case may be, ceases to be a Founding/Working Partner or REU Partner, as the case may be.

App. 315–16.

(describing identical provisions as conditions precedent). So for all four years, as long as any installment payment remained unpaid, a former partner risked forfeiting her remaining payments by engaging in Competitive Activity. And the partnership agreements gave the General Partner of each partnership—in each case an entity allegedly controlled by nonparty Howard Lutnick—"sole and absolute discretion" to determine, "in good faith," whether a former partner had engaged in Competitive Activity. App. 74. That determination would "be final and binding." *Id.*

That was not the only restraint on a former partner's ability to engage in Competitive Activity. For one to two years after her separation, a former partner was bound by covenant not to engage in Competitive Activity, or even to do anything that "could be considered . . . of th[at] nature."[6] App. 73, 317. The Former Partners call this the "Restrictive Covenant Device,"[7] App. 313, and the General Partner retained identical discretion to determine whether to use it. Thus, for the first one to two years when Conditioned Amounts were outstanding, former partners were barred from Competitive Activity by covenant and discouraged by the Conditioned Payment Device. For the latter two years, they were only discouraged. Although all former partners were subject to the Restrictive Covenant Device, none of the Former Partners in

---

[6] Partners were bound not to engage in the conduct described in subsection (A) of the Competitive Activity definition for one year following their separation, and all other defined conduct for two years.

[7] We refer to the Restrictive Covenant Device and Conditioned Payment Device jointly as the "Devices."

this action allege that Cantor Fitzgerald, BGC, and/or Newmark enforced that Device against them.

### B.    The Partnerships Exercise the Conditioned Payment Device

Four partners—Andrew Lewis, Cheyne Burnett, Tom Robertshaw, and Russell Scott[8]—separated from one or more of Cantor Fitzgerald, BGC, or Newmark and were denied Conditioned Amounts by operation of the Conditioned Payment Device.  Lewis, Burnett, Robertshaw, and Scott do not plead or argue that they refrained from Competitive Activity.

The three remaining Former Partners—Shawn McLoughlin, Robert Miller, and Angelo Sofocleous—signed separation agreements memorializing their Conditioned Amounts owed and other terms of their separation from Cantor Fitzgerald, BGC, and/or Newmark.[9]  McLoughlin's and Miller's agreements incorporated the partnership agreements' Devices.  Sofocleous's separation agreement contained its own nonsolicit and noncompete provisions, but did not "waive[] or modif[y] . . . any provisions of [Cantor Fitzgerald's] [p]artnership [a]greement."  App. 556.

BGC and Cantor Fitzgerald invoked the Conditioned Payment Device against McLoughlin, Miller, and Sofocleous,

---

[8] Because Mr. Scott is deceased, Olivia Scott is named as a plaintiff as a representative of Mr. Scott's estate.

[9] Unlike the other Former Partners, McLoughlin received his Conditioned Amounts over three years, instead of the standard four, under his separation agreement.

who also do not dispute that they engaged in Competitive Activity. McLoughlin and Sofocleous, however, plead additional context for those invocations.

In McLoughlin's case, BGC's president, Shaun Lynn, "repeatedly" represented that Lutnick "would allow [McLoughlin] to keep his partnership units so long as he did not go to one of BGC's large competitors." App. 353. "Relying on those representations," McLoughlin "sat out of employment a full year" and chose instead to consult for an outfit called LPS Partners. *Id.* "McLoughlin stayed in touch with Lutnick for more than a year after he left BGC and offered to help [Lutnick] hire employees that Lutnick wanted to terminate." App. 354. But "[s]hortly after" McLoughlin began working, Lutnick "accused him," without evidence, "of attempting to recruit another BGC partner." *Id.* Despite McLoughlin telling Lutnick the accusation was false, "BGC triggered the Conditioned Payment Device" and denied McLoughlin his Conditioned Amounts. *Id.*

Sofocleous also took a year of leave and then "repeatedly sought out advice from" Cantor Fitzgerald "on whether or not he could join" a London-based financial-services company called Marex. App. 354. Because Cantor Fitzgerald had "abandoned" the industry in which Marex operated, Sofocleous believed he could work for Marex without triggering the Conditioned Payment Device. *Id.* Cantor Fitzgerald, however, did not respond to Sofocleous's queries. Sofocleous joined Marex anyway. "Shortly thereafter," Cantor Fitzgerald invoked the Conditioned Payment Device. *Id.*

### C.      This Litigation

After the Delaware Court of Chancery held in a similar case that the Devices were unenforceable under Delaware law, *see Ainslie v. Cantor Fitzgerald, L.P.* (*Cantor I*), 2023 WL 106924, at \*26 (Del. Ch. Jan. 4, 2023), the Former Partners initiated this action.    When the Delaware Supreme Court reversed, *see Cantor II*, 312 A.3d at 692–93, the Former Partners amended their complaint.

The operative Complaint contains four claims.    The primary claim is that enforcement of the Devices violates Section 1 of the Sherman Act (15 U.S.C. § 1) by depressing wages, constraining supply, stifling innovation, and raising costs for firms in two principal national labor markets: the "Middle Market Investment Bank Labor Market" and "Interdealer Broker . . . Labor Market."[10]   App. 326.   The Former Partners allege their "pecuniary injur[ies]" were "direct and proximate result[s] of [the partnerships'] anticompetitive conduct."   App. 359.   The Former Partners then assert two claims related to their Sherman Act claim: breach of contract (for which the Former Partners seek payment of their remaining Conditioned Amounts) and a claim for a declaratory judgment that the Devices are unenforceable.[11]   Finally,

---

[10]   The Former Partners allege that the Middle Market Investment Bank Labor Market includes "two submarkets: (1) the Equity Capital Labor Submarket and (2) the Trader Labor Submarket."  App. 326.

[11] The Former Partners assert these first three claims on behalf of themselves and a putative class of Former Partners who were denied Conditioned Amounts.

McLoughlin and Sofocleous allege the partnerships violated Delaware's implied covenant of good faith and fair dealing by withholding Conditioned Amounts in bad faith.

The District Court granted the partnerships' motion to dismiss, holding that (1) the Former Partners had failed to plead an "antitrust injury," App. 6, which is necessary to assert an antitrust claim under the Sherman Act; and (2) the Former Partners failed to show the "subjective bad faith" required to breach the implied covenant "in the context of a partnership agreement" under Delaware law. App. 12. The Former Partners appealed.

## II.    JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction under 28 U.S.C. §§ 1331, 1332(d)(2), and 1337. We have jurisdiction under 28 U.S.C. § 1291.

Our review of the District Court's adjudication of a motion to dismiss is de novo. *Kalu v. Spaulding*, 113 F.4th 311, 324 (3d Cir. 2024). "We accept as true the factual allegations in the complaint, and draw all reasonable inferences in the plaintiff[s'] favor." *Phila. Taxi Ass'n, Inc v. Uber Techs., Inc.*, 886 F.3d 332, 338 (3d Cir. 2018).

## III.    DISCUSSION

To resolve this appeal, we must answer two questions: first, whether the Former Partners' losses amounted to the "antitrust injury" required for a Sherman Act claim; and second, whether the implied-covenant claim is plausible. Like the District Court, we answer both questions in the negative.

### A.    Antitrust Injury

Section 4 of the Clayton Act supplies a cause of action to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws," 15 U.S.C. § 15(a), including violations of the Sherman Act. *See Cromar Co. v. Nuclear Materials & Equip. Corp.*, 543 F.2d 501, 505 (3d Cir. 1976) (noting that Congress created Section 4 of the Clayton Act "[t]o ensure enforcement of the antitrust laws"). Despite that "extraordinarily broad language," *Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 171 (3d Cir. 2015), "not every person may sue" for violations of the Sherman Act, *Host Int'l, Inc. v. MarketPlace, PHL, LLC*, 32 F.4th 242, 248 (3d Cir. 2022). "[E]ven when there is a clear violation of the antitrust laws, § 4 allows only a 'proper plaintiff' to bring a private suit to remedy that violation." *Hanover*, 806 F.3d at 171 (quoting *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 544 (1983)).

A plaintiff is proper only if she has "antitrust standing, which is a threshold requirement in any antitrust case." *Phila. Taxi*, 886 F.3d at 343. Although the name "echoes the familiar formulation of Article III," *Host*, 32 F.4th at 249, antitrust standing is a "prudential limitation[]" that "does not affect the subject matter jurisdiction of the court, as Article III standing does." *Ethypharm S.A. Fr. v. Abbott Lab'ys*, 707 F.3d 223, 232 (3d Cir. 2013). The existence of antitrust standing turns on a five-factor test, but one factor—antitrust injury—is dispositive

here.[12]   "[A]ntitrust injury is 'a necessary but insufficient condition'" for antitrust standing, *Phila. Taxi*, 886 F.3d at 343 (quoting *Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 182 (3d Cir. 1997)), so "the absence of antitrust injury[] is enough to affirm the District Court's judgment" that the Former Partners' Sherman Act claim should be dismissed. *Host*, 32 F.4th at 249.

An antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). "[T]he antitrust laws were designed to protect [against] market-wide anticompetitive activities," *Eichorn v. AT & T Corp.*, 248 F.3d 131, 140 (3d Cir. 2001), not to protect "individual competitors." *Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d

---

[12] The four other factors are:

> (1) [a] causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing . . . [2] the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; [3] the existence of more direct victims of the alleged antitrust violations; and [4] the potential for duplicative recovery or complex apportionment of damages.

*Phila. Taxi*, 886 F.3d at 343 n.8 (internal quotation marks omitted).

323, 342 (3d Cir. 2018).  Thus, to demonstrate an injury of the type the antitrust laws were intended to prevent, "an individual plaintiff personally aggrieved by an alleged anti-competitive agreement" must plead and prove that "the activity has a wider impact on the competitive market." *Eichorn*, 248 F.3d at 140; *see also, e.g.*, *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 83 (3d Cir. 2010) ("To establish antitrust injury, a plaintiff must show harm to competition . . . ."). We have explained that, although an antitrust plaintiff must allege that she was injured in some way, she must also allege that "the 'challenged conduct affected the prices, quantity or quality of goods or services, not just [her] own welfare.'" *Host*, 32 F.4th at 250 (alterations omitted) (quoting *Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 641 (3d Cir. 1996)).  Our requirement that a plaintiff's injury derives from effects on price, quality, or quantity ensures that "[a]ntitrust injury does not arise . . . until a private party is adversely affected by an *anticompetitive* aspect of the defendant's conduct."  *Atl. Richfield Co. v. USA Petrol. Co.*, 495 U.S. 328, 339 (1990) (citing *Brunswick*, 429 U.S. at 487).

"Generally," plaintiffs who satisfy that requirement are "consumers and competitors in the restrained market and . . . those whose injuries are the means by which the defendants seek to achieve their anticompetitive ends." *Ethypharm*, 707 F.3d at 233 (quoting *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 102 (3d Cir. 2010)).  A plaintiff in the latter category must have an injury that is "inextricably intertwined" with the defendant's anticompetitive scheme, *id.* at 237 (internal quotation marks omitted), meaning there is a "significant causal connection" between her injury and an "antitrust conspiracy" that the defendant orchestrated with broader anticompetitive aims.  *Gulfstream III Assocs., Inc. v.*

*Gulfstream Aerospace Corp.*, 995 F.2d 425, 429 (3d Cir. 1993) (quoting *Int'l Raw Materials, Ltd. v. Stauffer Chem. Co.*, 978 F.2d 1318, 1328 (3d Cir. 1992)); *see W. Penn Allegheny*, 627 F.3d at 102 (noting that the defendant must have had "anticompetitive ends"); *Blue Shield of Va. v. McCready,* 457 U.S. 465, 479 (1982) (finding antitrust injury where the plaintiff's injury was "the very means by which" the defendant allegedly "sought to achieve its illegal ends").

The Former Partners argue they have adequately pleaded competitive harm deriving from their status as market participants.  They also argue that their injuries are inextricably intertwined with an anticompetitive scheme.  As explained below, neither argument convinces.[13]

### 1.    Harm to Competition

The Former Partners allege competitive harm in two principal ways.  First, they claim the Devices depressed wages, reduced the labor supply, and increased hiring costs for workers and firms in the Middle Market Investment Bank and Interdealer Broker Labor Markets, while stifling innovation more generally.  Second, the Former Partners cite academic, administrative, and judicial authority for the proposition that noncompetes "can restrain labor markets and produce anticompetitive effects," Opening Br. 40.  Both arguments fail.

---

[13] Because these conclusions are dispositive of the Former Partners' Sherman Act claim and related claims, we do not address the parties' alternative arguments about market definition, timeliness, the existence of concerted action, and the rule of reason.

As to the first argument, we reiterate that the Former Partners must plausibly plead "'that [their] loss comes from acts that reduce output or raise prices to consumers' in the relevant market." *Host*, 32 F.4th at 252 (quoting *Chi. Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 961 F.2d 667, 670 (7th Cir. 1992)). And they "'must make some showing of *actual injury* attributable to something the antitrust laws were designed to prevent,' not potential injury." *Id.* at 251–52 (quoting *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557–58 (1981)); *see also* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 337c (4th & 5th eds., 2025) [hereinafter "Areeda & Hovenkamp"] ("No matter how clear the violation, the private plaintiff must still prove that it was actually injured by the thing that makes the conduct unlawful under the antitrust laws."). The Former Partners' claims are too general and internally inconsistent for us to infer that their single concrete loss—the withholding of their unpaid Conditioned Amounts—derives from conduct that harmed competition.

The Complaint pleads generally that the Devices "disrupt[ed] the proper function of the wage-setting mechanism of a free labor market," restricting supply and increasing hiring costs. App. 349. The Former Partners explain that "[b]ecause [Cantor Fitzgerald's] and BGC's highest performing professionals are often owed millions of dollars in Conditioned [Amounts], the Conditioned Payment Device and the [s]eparation [a]greements operate to make it cost prohibitive" for other firms "to hire [Cantor Fitzgerald's] and BGC's best talent." App. 350. Although we normally credit a plaintiff's allegations when evaluating a motion to dismiss, the Former Partners' allegations on this score are at

odds with their own pleaded experiences.  The Former Partners all found new employment, so it could not have been cost-prohibitive to hire former partners who were burdened by the Devices.[14]  Without at least some additional support, the Former Partners' generic allegations do not make plausible that relevant labor markets were distorted, let alone that such distortions flowed through to them.

The Former Partners allege other injuries that sound like they derive from harm to competition, but are unsubstantiated by, or conflict with, the rest of their allegations.  For example, the Former Partners claim the Devices "caus[ed]" them to receive "lower wages and compensation," but do not explain why the Devices would affect the wage a third-party employer—unrestrained by the Devices—would pay.  App. 349.  The Former Partners also allege the Devices "artificially restrict[ed] the supply of professionals available to other firms" in the pleaded labor markets.  *Id.*  Evidently not; all the Former Partners found work.  The Former Partners claim the Devices

---

[14] The Former Partners argue that their decision to compete despite an anticompetitive restraint should not defeat antitrust standing.  We agree that mere persistence in the face of anticompetitive adversity might not, on its own, preclude antitrust injury.  *Cf. McCready*, 467 U.S. at 468 (finding antitrust injury where the plaintiff purchased psychotherapy services despite the defendant-insurer's reimbursement restriction).  But the point is that the Former Partners undermine their claim of harm to competition by alleging that they "had the clear opportunity to compete and did compete, sometimes successfully," *Race Tires Am.*, 614 F.3d at 84, without articulating how their competition was impaired by any market distortion.

"increas[e] the cost to [those] other firms," presumably to locate and hire talent.  *Id.*   But the Former Partners do not allege how *they* were hurt by any such cost increases and thus why the increases caused them, rather than the other firms, antitrust injury.  Finally, the Former Partners claim the Devices "deterred" them from seeking jobs after their departures.  App. 335.  Again, that is inconsistent with the rest of the partners' allegations because they all obtained jobs.  And in any event, the Former Partners fail to adequately allege that the deterrence flowed from any adverse change in the market for their services, rather than from a desire to avoid forfeiting a "contingent post-withdrawal financial benefit[]."  *Cantor II*, 312 A.3d at 692 (describing the Conditioned Amounts).

The one concrete injury the Former Partners consistently allege—the loss of their Conditioned Amounts— does not "reflect the anticompetitive effect either of [a] violation [of the Sherman Act] or of anticompetitive acts made possible by [a] violation." *Brunswick*, 429 U.S. at 489.[15]  The

---

[15] The Former Partners resist any reliance on *Brunswick* because, in their view, their "damages do not stem from [an] inability to extract greater profits from a less competitive market." Opening Br. 30 (emphasis omitted).  We agree that *Brunswick* is a somewhat awkward fit for this case.  The plaintiffs in *Brunswick* complained essentially about a procompetitive effect of the defendant's allegedly monopolistic market power; the Former Partners do not similarly allege that the Devices "preserved competition." *Brunswick*, 429 U.S. at 488.  But the fact that the Former Partners are *not* complaining about a procompetitive effect of the Devices does not mean they *are* complaining about an anticompetitive effect.  Conduct may also be "neutral as to

partnerships withheld the Conditioned Amounts because the Former Partners engaged in Competitive Activity. The withholding did not stem from or reflect "a negative impact on consumers or to competition in general."[16] *Phila. Taxi*, 886 F.3d at 344. Said differently, the Former Partners have not alleged how the Devices made life more difficult for them as participants in the relevant labor markets, and how, without the Devices, their experiences *as market participants* would have been better. Thus, the Former Partners have not alleged a "causal link" between harm to labor-market competition and the one concrete injury for which they seek redress—the withholding of their Conditioned Amounts. *Id.* at 343.

The Former Partners' second competition-related argument, about the potential anticompetitive effects of noncompetes or "forfeiture-for-competition clauses," fails for similar reasons. Opening Br. 42. Even if such provisions negatively affect "earnings," "job quality," "business formation and innovation," or other byproducts of competition *in general*, *id.* at 41–42 (citation omitted), the Former Partners must plausibly allege how the Devices, in particular, caused "*actual injury* attributable to something the antitrust laws were

---

competition," and in any event antitrust injury is possible only for a "loss stem[ming] from a competition-*reducing* aspect or effect of the defendant's behavior." *Atl. Richfield*, 495 U.S. at 344. As explained, the Former Partners have not alleged such a loss.

[16] Indeed, to the extent the Devices made the Former Partners less likely to find new work for a Competing Business, they *increased* the likelihood that the Former Partners would retain their Conditioned Amounts.

designed to prevent." *Host*, 32 F.4th at 252 (quoting *J. Truett Payne*, 451 U.S. at 558); *see also* Areeda & Hovenkamp ¶ 337c.  The Former Partners fail to allege that the Devices caused the posited effects in relevant markets, that those effects befell them, or that the effects relate to their loss of Conditioned Amounts.  When pleading antitrust injury, "potential harms do not suffice."  *Host*, 32 F.4th at 251 n.8 (rejecting reliance on anecdotal evidence and market study insufficiently tied to conduct at issue).  So the Former Partners' generalized claims about the deleterious effects of forfeiture-for-competition clauses and covenants not to compete do not show antitrust injury.

The Former Partners cite the Federal Trade Commission's (the "FTC") recent attempt to ban noncompetes as evidence that such agreements, and by extension the Devices, "can restrain labor markets and produce anticompetitive effects."  Opening Br. 40.  When it proposed that ban, the FTC located seventeen antitrust cases involving those covenants, of which fifteen were unsuccessful.  Non-Compete Clause Rule, 88 Fed. Reg. 3482, 3496 (Jan. 19, 2023) (codified at 16 C.F.R. pt. 910).[17]  "[I]n the vast majority of these [fifteen] cases, the party challenging the non-compete clause did not allege the non-compete clause adversely affected competition."  *Id.*

One recent decision, cited by the FTC and the Former Partners, found antitrust standing where the plaintiff alleged "the existence of unenforceable non-compete clauses, sham

---

[17] Although formally codified, the FTC's final rule was held unlawful and set aside by *Ryan, LLC v. FTC*, 746 F. Supp. 3d 369 (N.D. Tex. 2024).

litigation, and threats of legal action against doctors" to manipulate the market for concierge medical services. *Signature MD, Inc. v. MDVIP, Inc.*, 2015 WL 3988959, at *8 (C.D. Cal. Apr. 21, 2015). There, though, the plaintiff alleged harm stemming from the anticompetitive effects of the non-compete clauses: It "ha[d] not been able to enter large, affluent, urban" markets to sell its services. *Id.* at *9. That type of allegation is missing here.[18]

### 2.   Injury Inextricably Intertwined with an Anticompetitive Scheme

Next, the Former Partners claim that their loss of Conditioned Amounts was inextricably intertwined with the partnerships' decision to wield the Devices in a scheme for "anticompetitive ends." Opening Br. 32 (quoting *Hanover*, 806 F.3d at 172). We find that argument unpersuasive.

The Supreme Court first articulated the "inextricably intertwined" theory of antitrust injury in *McCready*. The plaintiff in *McCready* alleged that a medical insurer conspired with a group of psychiatrists to deny reimbursements for patients who visited clinical psychologists "unless the treatment was supervised by and billed through a physician." 457 U.S. at 468–70. The plaintiff was not a psychologist but a patient who visited a psychologist and was then denied reimbursement. *Id.* at 468. The Supreme Court rejected the argument that only the psychologists could suffer antitrust injury. *Id.* at 478. The plaintiff's harm—denial of

---

[18] We do not endorse or condemn the district court's analytic approach in *Signature MD*; we note only that the case is distinguishable on its facts.

reimbursement—"was the very means by which" the insurer "sought to achieve its illegal ends," and the denial of reimbursement "was a necessary step in effecting the ends of the alleged illegal conspiracy." *Id.* at 479. So "[a]lthough [the plaintiff] was not a competitor of the conspirators, the injury she suffered was inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market." *Id.* at 483–84.

Consistent with *McCready*'s focus on a defendant's objectives, our decisions applying the "inextricably intertwined" exception have, like *McCready*, focused on the defendants' use of the plaintiff as a "means" toward broader "anticompetitive ends." *Lifewatch*, 902 F.3d at 342. In *Lifewatch*, for example, health insurers concertedly refused to cover a certain kind of outpatient cardiac monitor. *Id.* at 331–34. The insurers' ends were anticompetitive: self-enrichment "by shifting demand to less expensive treatment options." *Id.* at 335 n.7. The plaintiff—a supplier of the cardiac monitors, not a competitor or consumer of the insurers—could therefore characterize its "lost profits from depressed . . . sales" as an antitrust injury. *Id.* at 342. Said otherwise, the insurers sought to profit not at the plaintiffs' expense, but at the expense of competition in the outpatient cardiac monitor market, and the supplier's injury was inextricably intertwined with that scheme. The same pattern occurred in *Hanover*, where a grocer bombarded a grocery-store landlord with lawsuits and administrative gamesmanship to keep a rival grocer out of the local grocery market. 806 F.3d at 167–70. The defendant-grocer's "end goal . . . was to injure" its competitor and thereby profit from reduced competition. *Id.* at 174. In these cases, as in *McCready*, the defendants were charged "with a

purposefully *anticompetitive scheme*." *McCready*, 457 U.S. at 483.

Such allegations are absent here. The Former Partners argue the partnerships used the Devices "to harm [the partnerships'] competitors"—other financial-services firms—by keeping the Former Partners away from them. Opening Br. 33. But the Complaint does not describe such a scheme. In fact, the Former Partners allege the partnerships had another motivation: prizing money from former partners.

The Complaint makes that claim three times. First, the Former Partners allege the partnerships used the Conditioned Payment Device "to effectuate a scheme . . . to enrich themselves *at the expense of their former employees*," App. 306 (emphasis added), not at the expense of competition. The Complaint repeats the allegation, claiming the Conditioned Payment Device was a tool for the partnerships "to enrich themselves *at the expense of those who are either terminated or who voluntarily leave the partnerships*." App. 319 (emphasis added). Consistent with that motive, the partnerships offered separation agreements to departing partners with the "intention" of duping those partners into forfeiting their Conditioned Amounts—not undermining other firms seeking financial-services talent. App. 320.

These allegations do not describe a scheme "premised on restraining the employment market," Areeda & Hovenkamp ¶ 377a (rev. ed. 1995), which would be consistent with "anticompetitive intent," *Angelico v. Lehigh Valley Hosp., Inc.*, 184 F.3d 268, 275 (3rd Cir. 1999). Rather, the claim is that the partnerships attempted to harm *the Former Partners* by

effectively transferring money from their pockets to the partnerships'.[19]

The Complaint plausibly pleads that the partnerships used adhesion contracts to recoup the Former Partners' earned compensation and impound money the Former Partners had contributed to the partnerships. Those objectives might be unsavory, but they are not anticompetitive. The Former Partners fail to plausibly allege how taking money from them affects competition for financial-services talent or evinces an attempt to gain an anticompetitive advantage over competitors by "affect[ing] the prices, quantity[,] or quality" of labor. *Host*, 32 F.4th at 250. The Former Partners thus cannot invoke the "inextricably intertwined" exception and fail to show antitrust injury. Without a plausible allegation of antitrust injury, the Former Partners cannot state a Sherman Act claim. *See Phila. Taxi*, 886 F.3d at 343. We therefore conclude that the District Court properly dismissed Count I of the Complaint. And

---

[19] To be sure, the Former Partners at times gesture toward an anticompetitive purpose; they allege, for example, that the partnership agreements containing the Devices "have no purpose except stifling competition." App. 328. But because the Former Partners allege specifically and repeatedly that the partnerships used the Devices to requisition the Former Partners' money, the Former Partners' "bald" and "conclusory" allegations about the Devices' purpose are "not entitled to be assumed true." *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009); *see also Finkelman v. Nat'l Football League*, 810 F.3d 187, 202 (3d Cir. 2016) ("[E]ven at the pleading stage, 'we need not accept as true unsupported conclusions and unwarranted inferences.'" (quoting *Maio v. Aetna, Inc.*, 221 F.3d 472, 500 (3d Cir.2000))).

because Counts II and III depend on Count I for their success, the District Court properly dismissed those claims, as well.

## B.     Implied Covenant of Good Faith and Fair Dealing

We turn now to McLoughlin's and Sofocleous's claims that the manner of the partnerships' enforcement of the Conditioned Payment Device against them violated the implied covenant of good faith and fair dealing under Delaware law. We conclude that neither claim is viable.

In Delaware, the implied covenant of good faith and fair dealing "is inherent in all contracts and is used to infer contract terms 'to handle developments or contractual gaps that the asserting party pleads neither party anticipated.'" *Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017) (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010)). Because the covenant is a gap-filling device, it "impl[ies] only those terms that the parties would have agreed to during their original negotiations if they had thought to address them"; it cannot rewrite express terms. *Gerber v. Enter. Prods. Holdings, LLC*, 67 A.3d 400, 418 (Del. 2013), *overruled in part on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013). Thus, a court confronting an implied-covenant claim must "determine[] whether the language of the contract expressly covers a particular issue, in which case the implied covenant will not apply, or whether the contract is silent on the subject, revealing a gap that the implied covenant might fill." *NAMA Holdings, LLC v. Related WMC LLC*, 2014 WL 6436647, at *16 (Del. Ch. Nov. 17, 2014). If a "contract is 'truly silent' about [an] issue, and the express terms of the . . . agreement naturally imply certain corresponding conditions," the contract's "terms [are] enforced according to the

reasonable expectations of the parties at the time of contracting." *Baldwin v. New Wood Res., LLC*, 283 A.3d 1099, 1117 (Del. 2022) (quoting *Dieckman*, 155 A.3d at 361).

Although contract language reigns supreme in the implied-covenant context, a party with sole discretion to act may not act without restraint. The implied covenant still prevents the party from wielding its discretion "arbitrarily or unreasonably [to] frustrat[e] the fruits of the bargain that the asserting party reasonably expected." *Id.* at 1118 (quoting *Dieckman*, 155 A.3d at 367); *Winshall*, 76 A.3d at 816 ("[W]hen a contract confers discretion on one party, the implied covenant of good faith and fair dealing requires that the discretion . . . be used reasonably and in good faith.").[20]

Because, on the facts pled, the relevant agreements expressly permitted the termination of McLoughlin's and Sofocleous's Conditioned Amounts, their implied-covenant claims fail.[21] Start with McLoughlin. He alleges that Lynn,

---

[20] The Former Partners argue that an implied-covenant plaintiff need only claim that a defendant "did not reasonably believe that it was acting in the best interests of the [p]artnership." Opening Br. 56 (quoting *Brinckerhoff v. Enbridge Energy Co.*, 159 A.3d 242 (Del. 2017)) (cleaned up). The Former Partners' reliance on *Brinckerhoff* is mistaken. That case addressed a contractual good-faith provision, not the implied covenant, and derived its "reasonably believe" standard from language in the relevant contract. *See Brinckerhoff*, 159 A.3d at 260 & n.62. *Brinckerhoff*'s interpretation of a contract does not control our application of the implied covenant.

[21] McLoughlin alleges he was denied Conditioned Amounts "owed to . . . [him] under Section 2" of his separation

BGC's president, repeatedly "told" him that he could accept most forms of alternate employment and that he "[relied] on those representations" when deciding to consult for LPS Partners. App. 353. But McLoughlin does not dispute that Lynn's representations and his subsequent conduct do not square with the BGC partnership agreement's definition of Competitive Activity. And that agreement provides that the definition of Competitive Activity cannot be changed "except as otherwise agreed to *in writing* by the General Partner." App. 73 (emphasis added). Because McLoughlin did not obtain Lynn's representations in writing from the General Partner, and the partnership agreement predetermined that oral representations would be ineffective, there was no gap to fill, and McLoughlin cannot complain that withholding his Conditioned Amounts despite Lynn's promises breached the implied covenant.

McLoughlin also alleges that, before BGC "trigger[ed] the Conditioned Payment Device," Lutnick, who controlled

---

agreement. App. 322. That section lists the amounts owed to McLoughlin and generally obligates BGC to pay those amounts. Thus, BGC owed the Conditioned Amounts to McLaughlin under the separation agreement. The denial of those amounts, however, occurred because of the Conditioned Payment Device in the partnership agreement. As Section 2(f) of McLoughlin's separation agreement makes clear, "all of [his] rights and obligations [t]hereunder are subject to the terms and conditions of . . . the BGC[] Partnership Agreement." App. 526. Unlike McLoughlin, Sofocleous alleges he was denied Conditioned Amounts "pursuant to the Conditioned Payment Device contained in [his separation] agreement," App. 322, which we discuss below.

BGC's General Partner, accused him falsely and without evidence of "attempting to recruit another BGC partner." App. 354. Because the implied covenant (and BGC's partnership agreement) required BGC's General Partner to determine in "good faith" whether McLoughlin engaged in Competitive Activity, *Baldwin*, 283 A.3d at 1116 (internal quotation marks omitted); App. 74, McLoughlin's claim is stronger here; invoking the Conditioned Payment Device without evidence might constitute the "arbitrar[y] or unreasonabl[e]" conduct the implied covenant prohibits. *Nemec*, 991 A.2d at 1126; *see Dieckman*, 155 A.3d at 368 (finding a general partner could not "use false or misleading statements" to trigger safe harbor provisions).

But Lutnick's accusation of solicitation cannot sustain an implied-covenant claim because McLoughlin already had engaged in Competitive Activity, as he admits, by consulting for LPS Partners. *See* App. 354 (alleging that Lutnick accused McLoughlin of solicitation only "after McLoughlin started working again"). That gave BGC an adequate and independent reason to withhold McLoughlin's Conditioned Amounts in good faith, under the partnership agreement's express terms. Thus, McLoughlin cannot plausibly claim that Lutnick's allegedly evidence-free accusation "frustrat[ed] the fruits of the bargain that [he] reasonably expected," *Baldwin*, 283 A.3d at 1118; he already had failed to satisfy the noncompetition condition precedent to his receipt of Conditioned Amounts.[22]

---

[22] We might reach a different conclusion if McLoughlin had alleged that BGC withheld his Conditioned Amounts only because of his purported solicitation, and not because of his competition. But the Complaint does not make that claim; at best, it alleges that BGC invoked the Conditioned Payment

Like McLoughlin, Sofocleous, who worked for Cantor Fitzgerald, does not dispute that his decision to work for another financial-services firm constituted Competitive Activity under his separation agreement or Cantor Fitzgerald's partnership agreement.[23] He claims only that he "received no response" when he asked Cantor Fitzgerald about the scope of the noncompetition condition. App. 354. And he argues now that Cantor Fitzgerald's silence "induc[ed] him" to work for another firm. Opening Br. 53.

But Cantor Fitzgerald was not contractually obligated to respond to Sofocleous's queries or to give him interpretive guidance. And the implied covenant did not require Cantor Fitzgerald to reach beyond its contractual duties for Sofocleous's benefit. *See Winshall*, 76 A.3d at 817 (recognizing that a duty not to minimize earn-out payments in a merger agreement did not imply an affirmative obligation to maximize them); *Nemec*, 991 A.2d at 1128 ("A party does not act in bad faith by relying on contract provisions for which that party bargained where doing so simply limits advantages to another party."); *cf. NAMA Holdings*, 2014 WL 6436647, at

---

Device because BGC believed McLoughlin had solicited *and* competed, and thus had violated the Competitive Activity condition in two ways.

[23] Sofocleous's separation agreement prohibited him from joining a "Competing Business," and made compliance with that prohibition a condition precedent to his receipt of Conditioned Amounts. App. 558–59. Sofocleous also remained bound by the corresponding condition in Cantor Fitzgerald's partnership agreement, which his separation agreement expressly did not "waive[] or modif[y]." App. 556.

*17 ("[T]he implied covenant does not establish a free-floating requirement that a party act in some morally commendable sense."). Nor does Sofocleous allege that Cantor Fitzgerald engaged in "fraud, deceit, or misrepresentation," which could implicate the implied covenant without a contractual duty. *Cincinnati SMSA L.P. v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 993 (Del. 1998) (internal quotation marks omitted). In short, Sofocleous's separation agreement and Cantor Fitzgerald's partnership agreement gave Cantor Fitzgerald the "express contractual right" to withhold Sofocleous's Conditioned Amounts, leaving no gap for the implied covenant to fill. *Nemec*, 991 A.2d at 1127. And Sofocleous has not alleged that Cantor Fitzgerald's General Partner exercised its discretion in bad faith.

## IV.    CONCLUSION

For the reasons discussed above, we will affirm the District Court's judgment.